# UNITED STATES DISTRICT COURT
# FOR THE
# DISTRICT OF MASSACHUSETTS

_____  )
                                 )
**UNITED STATES OF AMERICA** )
                                 )
**V.**                           )                    **CASE NO. 1:23-cr-10130**
                                 )
                                 )
**LITANG LIANG**                 )
_____  )


# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
# MOTION TO DISMISS

# TABLE OF CONTENTS

**I. Factual Background** ...........................................................................................................3

**II. Legal Standard** ...............................................................................................................6

**III. Argument** .....................................................................................................................6

    A. The Indictment Fails to Allege Facts to Support the Charge Mr. Liang engaged in
Conspiracy to Violate 18 U.S.C § 951...........................................................................6

    B. The Indictment Fails to Allege Facts to Support the Charge that Mr. Liang was an Agent
of the PRC and Failed to Register as Such. ................................................................9

    C. Prosecuting Mr. Liang as a Foreign Agent Impermissibly Restricts and Infringes upon Mr.
Liang's Constitutional Right to Free Speech. ...........................................................12

    D. 18 U.S.C. §951 is Unconstitutionally Vague and Impermissibly Criminalizes Acts
Protected by the First Amendment. ...........................................................................16

**IV.  CONCLUSION** ...........................................................................................................**18**

**CERTIFICATE OF SERVICE** .........................................................................................**20**

**TABLE OF AUTHORITIES**

**Cases**                                                                                          **Page(s)**

*Airport Comm'rs v. Jews for Jesus*, 482 U.S. 569 (1987)...........................................................14
*Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990) …......…….....................12
*Boos v. Barry*, 485 U.S. 312 (1988) ..................................................................................14
*Bridges v. California*, 314 U.S. 252 (1941)........................................................................13
*Buckley v. Valeo*, 424 U.S. 1 (1976) …………………………………………….............16
*Citizens United v. FEC*, 558 U.S. 310 (2010)....................................................................13
*Connolly v. General Constr. Co.*, 269 U.S. 385 (1926) ……………………………………16
*FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449 (2007)........................................................13
*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ……………………………….....17, 19
*Hamling v. United States*, 418 U.S. 87 (1962) ……………….…..………………6, 8,12
*Johnson v. United States*, 576 U.S. 591 (2015)..................................................................17
*Mills v. Alabama*, 384 U.S. 214 (1966) ……………………………………………...12, 16
*Minnesota Voters Alliance v. Mansky*, 585 U.S. __ (2018).................................................12
*N.A.A.C.P. v. Button*, 371 U.S. 415 (1963) ………………………………………….....13
*NAACP v. Patterson*, 357 U.S. 449 (1958) ……………………………………………....15
*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) ……………………………….13,14
*Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37 (1983) …………………..14
*Roth v. United States*, 354 U.S. 476 (1957) ……………………………………………...13
*Russell v. United States*, 369 U.S. 749 (1962) …………………………….………… 6, 8,12
*Smith v. Goguen*, 415 U.S. 566 (1974) ………………………………………………….17
*Terminiello v. City of Chicago*, 337 U.S. 1 (1949) …………………………………13, 14
*United States v. Alvarez*, 132 S.Ct. 2537 (2012) ……………………………………….19
*United States v. Associated Press*, 52 F.Supp. 362 (S.D.N.Y. 1943) …………………....14
*United States v. Carrll*, 105 U.S. 611 (1881) ……………………………………………..6
*United States v. Dumeisi*, 2003 WL 22757747 (N.D. Ill. Nov. 20., 2003) ………………10
*United States v. Latchin*, 2005 WL 8160638 (N.D. Ill. July 26, 2005) …………………..10
*United States v. Llinas*, 373 F.3d 26 (1st Cir. 2004) …………………………………...…7
*United States v. Miselis*, 972 F.3d 518 (4th Cir. 2020) ………………………….....17, 19
*United States v. Ngige*, 780 F.3d 497 (1st Cir. 2015) …………………………………….6
*United States v. Portalla*, 496 F.3d 23 (1st Cir. 2007) ……………………………....7, 8
*United States v. Rafiekian*, 991 F.3d 529 (4th Cir. 2021) …………………..………9, 10,11
*United States v. Rivera-Santiago*, 872 F.2d 1073 (1st Cir.)……………………………….7
*United States v. Savarese*, 686 F.3d 1 (D. Mass. 2012) …………………………………..6
*United States v. Taderera*, No. 17-10158-FDS (D. Mass. Apr. 10, 2018)…………………..6
*United States v. Williams*, 553 U.S. 285 (2008) ………………………………………17,18
*United States v. Ying Lin*, 2018 WL 5113139 (E.D.N.Y. Oct. 19, 2018)……………….…10
*Virginia v. Black*, 538 U.S. 343 (2003) ……………………………………………….13
*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943)………………………………14

**Statutes**
18 U.S.C. §951 …………………………………………………………………….3,4,7,8,16
Pub. L. 98-473, § 1209, 98 Stat. 1837 (Oct. 12, 1984) ……………………………………17

### I.    Factual Background

Mr. Liang is a United States citizen who has lived in the United States for over three decades.  He is married with two children, both of whom are United States citizens. As a hotel employee in Boston, Mr. Liang was an active member of his union, UNITE HERE Local 26. For years, Mr. Liang has been a community organizer and activist in the Chinese-American community in Boston, serving on the Board of Directors for Chinatown Main Street, the Chinese Consolidated Benevolent Association of New England, and, ultimately, helped to found the New England Alliance for the Peaceful Reunification of China. Through his activism, Mr. Liang has developed and maintained relationships with numerous community members with similar views and goals. In his efforts to promote his views and the organizations with which he is affiliated, Mr. Liang has participated in public events, community meetings; he also traveled to China to attend conferences and events related to his political and community activism.

On May 4, 2023, Mr. Liang was indicted by the federal government on charges of conspiracy to violate the notification requirement under 18 U.S.C. §951 and acting as an agent of the People's Republic of China ("PRC") without notifying the Attorney General.  In its twenty-page indictment against Mr. Liang, the Government charges Mr. Liang with the two counts as follows:

> Count One, Conspiracy to act as agent of a foreign government without prior notification in violation of 18 U.S.C § 371: Litang Liang, knowingly and intentionally conspired with others, known and unknown to the Grand Jury, to commit an offense against the United States, to wit, Acting as an Agent of a Foreign Government, that is, to knowingly act and cause others to act in the United States as an agent of a foreign government, namely, the

People's Republic of China, without prior notification to the United States Attorney General, in violation of 18 U.S.C. §951.

Count 2, Acting as an agent of a foreign government without notice to the Attorney General in violation of 18 U.S.C. § 951: Litang Liang, knowingly acted and caused others to act in the United States as an agent of a foreign government, namely, the People's Republic of China, without providing prior notification to the United States Attorney General, as required by law.

The Government describes Mr. Liang's alleged criminal behavior as follows: "providing the PRC government with information on Boston-area individuals and organizations; organizing a counter-protest in the United States against pro-democracy dissidents; providing photographs of and information about U.S.-based dissidents to PRC government officials; and providing the names of potential recruits to the PRC's Ministry of Public Security."  Indictment, ECF 1, ¶2. Throughout 2018, the indictment alleges Mr. Liang acted as an "agent" of the PRC by communicating with alleged PRC officials regarding the destruction of PRC flags in Chinatown, and providing "information about local Chinese family associations. . . including the size of the groups' memberships and the names of some group leaders." *Id*. at ¶ 4(a), (e), (h). The indictment further alleges that Mr. Liang traveled to the PRC for a conference allegedly associated with the United Front Work Department, and communicated with PRC officials regarding his travel plans and with whom Mr. Liang would be traveling to the PRC to attend the conference. *Id*. at ¶¶ 5-8. The indictment then alleges Mr. Liang "co-founded the New England Alliance for the Peaceful Reunification of China ("NEAPUC") and subsequently served as its Vice President. *Id*. at ¶¶ 9-11. The Government inexplicably alleges Mr. Liang established this organization, which clearly aligns with his personal and political views and activities, "in order

to appear to be acting as a member of a local community organization unconnected to the PRC government, when in fact he was acting at the direction or control of the PRC government."  *Id*. at ¶ 36(c).

In 2019, Mr. Liang is alleged to have "engaged in a series of communications with other individuals, including PRC government officials, about organizing a counter-protest" to a rally set to take place in Boston called "Boston Stands with Hong Kong."  Thereafter, the indictment proceeds to detail twelve separate communications between Mr. Liang, a community-based activist in support of the reunification of China, and various members of Boston organizations and alleged PRC officials regarding their plans for said counter-protest. *Id*. at ¶14. Mr. Liang is alleged to have then been "present" at the counter-protest and "passed out a large PRC flag to the counter-protestors." *Id*. at ¶ 15. The indictment further alleges Mr. Liang took photographs and videos of counter-protestors and "the anti-extradition, pro-democracy dissidents," *Id*. at ¶ 16, and exchanged said photographs and videos and had phone calls with alleged PRC officials. ¶¶ 17-19. Mr. Liang is then alleged throughout the remainder of 2019 to have communicated with alleged PRC officials regarding his organization's work, and his attendance at a conference in the PRC. *Id*. at ¶¶ 23-28. Finally, Mr. Liang is alleged to have invited two individuals to tour the Chinese Embassy. *Id*. at ¶¶ 31-32.

In sum, Mr. Liang, a United States citizen and long-time resident of Massachusetts, who is simply well-known, community-based activist who supports the political reunification of China, is alleged to have acted as an "agent" of the People's Republic of China because he "communicated with the PRC government officials-- knowing them to be PRC government officials-- in several ways." *Id*. at ¶ 3.

## II.    Legal Standard

Federal Rule of Criminal Procedure 12(b)(3)(A) and (B) provides that a defendant must make "a motion alleging a defect in instituting the prosecution" or "a defect in the indictment or information" or "failure to state an offense" via pretrial motion.  "It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.'" *Hamling v. United States*, 418 U.S. 87, 117 (1962) (quoting *United States v. Carrll*, 105 U.S. 611, 612 (1881)).  It follows that an indictment is constitutionally insufficient if it does not connect the elements of the crime with the factual assertions. *See Russell v. United States*, 369 U.S. 749, 763-771 (1962); *see Hamling*, 418 U.S. at 117. "'An indictment that tracks the language of the underlying statute is usually sufficient' as long as it is 'accompanied by such a statement of facts and circumstances as to inform the accused of the specific offense with which he is charged.'" *United States v. Taderera*, No. 17-10158-FDS (D. Mass. Apr. 10, 2018) (quoting *United States v. Savarese*, 686 F.3d 1, 6 (D. Mass 2012). "When a defendant seeks dismissal of an indictment, courts take the facts alleged in the indictment as true." *United States v. Ngige*, 780 F.3d 497, 502 (1st Cir. 2015).

## III.    Argument

### A.  The Indictment Fails to Allege Facts to Support the Charge that Mr. Liang was in a Conspiracy to Violate 18 U.S.C § 951

Count I of the indictment alleges "Litang Liang, knowingly and intentionally conspired with others, known and unknown to the Grand Jury, to commit an offense against the United States, to wit, Acting as an Agent of a Foreign Government, that is, to knowingly act and cause others to act in the United States as an agent of a foreign government, namely, the People's

Republic of China, without prior notification to the United States Attorney General, in violation of 18 U.S.C. §951."

"To prove the elements of the crime of conspiracy, the government must show the existence of a conspiracy, the defendant's knowledge of the conspiracy, and the defendant's voluntary participation in the conspiracy." *United States v. Llinas*, 373 F.3d 26, 30 (1st Cir. 2004). "More specifically, to establish that a defendant belonged to and participated in a conspiracy, the government must prove two kinds of intent: 'intent to agree and intent to commit the substantive offense.'" *Id.* (quoting *United States v. Rivera-Santiago*, 872 F2d 1073, 1079 (1st Cir.). Additionally, the evidence must support the contention that (1) there was a conspiracy, (2) the defendant knew about the conspiracy, and (3) the defendant knowingly and voluntarily participated in said conspiracy. *See United States v. Portalla*, 496 F.3d 23, 26 (1st Cir. 2007). The third element requires that the government establish the defendant's "intention to join the conspiracy" and the defendant's intention "to effectuate the objects of the conspiracy." *Id.*

As detailed in the indictment, Mr. Liang is charged with conspiring to act as an agent of a foreign government *without prior notification*. As Section 951 makes clear, it is not illegal to act as an agent of a foreign government. 18 U.S.C. §951. Rather, it is illegal to act as an agent of a foreign government *without prior notification to the United States Attorney General. Id.* Put another way, the illegality is not the agent-principal relationship itself, it is the failure to notify the Attorney General of such a relationship. Therefore, Mr. Liang must be alleged to have entered into an agreement to act as an agent of the PRC, *with the explicit, agreed upon intention of doing so without notifying the United States Attorney General*.

In the indictment, there are zero allegations which would support the contention that Mr. Liang entered into a conspiracy to act as an agent of the PRC *without notification*. In fact, at no

point does the indictment claim that (1) there was a conspiracy to create an agency relationship with the PRC without proper notification, (2) that Mr. Liang was ever aware of any such conspiracy or agreement, or any requirement to notify the Attorney General of his communications or actions, or (3) that Mr. Liang "knowingly and voluntarily" participated in such a conspiracy. *See Portalla*, 496 F.3d at 26. Therefore, the indictment against Mr. Liang as to Count One is "constitutionally insufficient [as] it does not connect the elements of the crime with the factual assertions" and, therefore, must be dismissed. *See Russell*, 369 U.S. at 763-771 (1962); *see Hamling*, 418 U.S. at 117.

The intent the government must prove is the intent to violate the notification requirement. Obviously, one cannot conspire to violate a requirement if one does not know of its existence. The indictment does not allege facts to establish knowledge of Mr. Liang regarding the notification requirement. Notably, the statute does not require notification by everyone who acts as agent of a foreign government. It requires notification by those required under sub-section b of the statute. 18 USC §951 (b) states "The Attorney General shall promulgate rules and regulations establishing requirements for notification." The indictment does not state Mr. Liang knew that his conduct potentially fell under 18 USC §951 (b) pursuant to rules and regulations promulgated by the Attorney General. Without facts that alleges such knowledge, the government cannot state a claim that supports the charge of conspiracy. To clarify, Mr. Liang is not raising an ignorance of law defense. Rather, he argues the government has not established knowledge of the subject or purpose of the conspiracy itself: To avoid notification requirement while acting as an agent of a foreign government. In short, the indictment for conspiracy must be dismissed for failure to state a claim.

B. **The Indictment Fails to Allege Facts to Support the Charge that Mr. Liang was an Agent who Agreed to Act Subject to the Direction and Control of the PRC and Failed to Register as Such.**

Pursuant to 18 U.S.C. § 951(a), "[w]hoever, other than a diplomatic or consular officer or attache, acts in the United States as an agent of a foreign government without prior notification to the Attorney General if required in subsection (b), shall be fined under this title or imprisoned not more than ten years, or both." The term "agent of a foreign government," is defined as "an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official." 18 U.S.C. § 951(d). In *United States v. Rafiekian*, the Fourth Circuit stated that, "to be an 'agent of a foreign government,' a person must 'agree[] to operate . . . subject to [foreign] direction or control,'" and 18 U.S.C. § 951's "definition of 'agent' envisions a mutual agreement to operate subject to foreign direction or control." 991 F.3d 529, 539 (4th Cir. 2021). Even more, to be considered an "agent," under 18 U.S.C. § 951, one "must do more than act in parallel with a foreign government's interests or pursue a mutual goal." *Id*. at 538 (noting the district court rejected "a substantially more expansive construction" of the term "agent"). An individual's "agreement" to operate as an agent of a foreign government must be "mutual" and "a person does not become an 'agent' for purposes of § 951 simply by acting in accordance with foreign interests or by privately pledging allegiance." *Id*. at 541.

In guidance issued by the Department of Justice, the Department identified six factors which may be considered in determining whether an individual is an "agent" of a foreign government: (1) whether the individual in particular was specifically identified and requested to act by the foreign government; (2) whether the foreign government set forth a specific act or conduct it requested of the alleged "agent,"; (3) whether the foreign government compensated or coerced the agent to act on its request; (4) "[w]hether the political activities align[ed] with the

person's own interests; (5) "[w]hether the position advocated aligns with the person's subjective viewpoint; and, (6) "[t]he nature of the relationship between the person and" the foreign government. FARA Unit, Dep't of Justice, *The Scope of Agency Under FARA*, https://www.justice.gov/nsd-fara/page/file/1279836/dl, 3-4 (May 2020). The guidance further states that to establish an agency relationship, "these circumstances must evince some level of power by the principal over the agent or some sense of obligation on the part of the agent to achieve the principal's request." *Id*. at 3.

While significantly lengthy and detailed, the indictment does not allege that Mr. Liang was, at any time, specifically identified and requested to act by the People's Republic of China. Furthermore, the indictment does not allege that the PRC compensated or coerced Mr. Liang to act on its behalf. Importantly, there is no assertion of a "mutual agreement" in the indictment to suggest that Mr. Liang and the PRC agreed that Mr. Liang would act at the direction and control of the PRC. *See Rafiekian* 991 F.3d at 541.[1] Moreover, at no point does the indictment assert that Mr. Liang was doing anything because he was compelled to act by PRC. Instead, Mr. Liang's political beliefs and activities merely align with those of the PRC. Additionally, as a well-connected individual community activist for the reunification of China in the city of Boston, Mr. Liang was in contact with individuals with whom he had a personal and professional relationship and engaged in communications with said officials related to their common views and interests.

---

[1] *Cf. United States v. Ying Lin*, 2018 WL 5113139 (E.D.N.Y. Oct. 19, 2018) (case withstood motion to dismiss. Indictment alleged that the defendant was subject to the direction and control of a foreign government when she smuggled items onto Carrier flights to the PRC and, in return, "received benefits from the PRC Mission and the PRC Consulate beyond her compensation as an employee of the Carrier" including tax-exempt liquor, electronic devices, and free contracting work by PRC construction workers); *United States v. Latchin*, 2005 WL 8160638 (N.D. Ill. July 26, 2005) (case withstood motion to dismiss because defendant allegedly was compensated for services and "paid through his handlers"); *United States v. Dumeisi*, 2003 WL 22757747 (N.D. Ill. Nov. 20., 2003) (case survived motion to dismiss when defendant was alleged to have received compensation for collecting and sharing information with foreign government).

Though not binding on this Court, the Department of Justice's own guidance makes clear that Mr. Liang's activities did not meet the requirements for a finding of an agency relationship. The facts alleged in the indictment do not suggest there was any "power" by the PRC over Mr. Liang, or that there was "some sense of obligation on the part of [Mr. Liang] to achieve the [PRC's] request." *The Scope of Agency Under*

at 3. The allegations do not support a contention that Mr. Liang owed some duty or obligation to the PRC. Instead, the indictment's own references make clear that Mr. Liang was simply acting to further the political views of himself and his organization. Specifically, the indictment spends nearly five pages detailing Mr. Liang's involvement in organizing a counter-protest to a Boston Hong Kong rally. *Indictment* at ¶ 12-22. However, these allegations make clear Mr. Liang was not acting as an agent, but rather was acting "in parallel" with the PRC's interests and perhaps pursuing a "mutual goal." *See Rafiekian* 991 F.3d at 541; *Indictment* at ¶14(e) ("Individual 4" asks Liang if his group would provide support at the counter-protest, to which Liang says he will); ¶14(k) (Liang sends logistical information to his group regarding the counter-protest); ¶14(l) Liang asks a contact named "PRC Official 1" "to notify two members of Organization F, a local Chinese community organization, to gather in front of the State House to condemn the Hong Kong activists") (PRC Official 1 tells Liang that such counter protests "should be mostly voluntary" and that the PRC Official would not be involved in the planning of said counter protest because "however they want to handle it specifically will be up to them, voluntarily"). Moreover, the indictment notes that a PRC Official thanked Mr. Liang for his work to organize a counter protest, undercutting any assertion that Mr. Liang was being "ordered" or was in any way "obligated" to act under some alleged "power" of the PRC. *See Indictment* ¶ 14(l) (PRC Official says to Liang, "thank you for your hard work!"). Again,

though the indictment makes conclusory statements that Mr. Liang acted "at the direction or control of the PRC government," the surrounding allegations simply show that Mr. Liang was never "obligated" or "required" to act.  *Indictment* at ¶36.

Rather, the surrounding allegations make clear that while Mr. Liang may be alleged to have responded to requests or suggestions and engaged in conversation with alleged PRC Officials, the circumstances do not "evince some level of power by the principal over the agent or some sense of obligation on the part of the agent to achieve the principal's request."  *The Scope of Agency Under FARA* at 3.  Therefore, the indictment against Mr. Liang is constitutionally insufficient as it "does not connect the elements of the crime with the factual assertions," and the indictment must be dismissed.  *See Russell*, 369 U.S. at 763-771; *see Hamling*, 418 U.S. at 117.

### C. Prosecuting Mr. Liang as a Foreign Agent Impermissibly Restricts and Infringes upon Mr. Liang's Constitutional Right to Free Speech

The charges against Mr. Liang's violated his constitutional rights to free speech and free association. The First Amendment to the United States Constitution provides "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press…" U.S. const. amend I; *Minnesota Voters Alliance v. Mansky*, 585 U.S. __; 138 S. Ct 1876 (2018).  "[T]here is practically universal agreement that a major purpose of [the First] Amendment was to protect free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966).  Protections for political speech, defined by Justice Scalia as "the right of any person, or of any association of persons, to speak out on political matters," had already been envisioned by the time the Bill of Rights was proposed to Congress in 1789. *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 680

(1990 (Scalia, J., dissenting) (noting that "Those Founders designed, of course, a system in which popular ideas would ultimately prevail; but also, through the First Amendment, a system in which true ideas could readily become popular"). In 2003, the Supreme Court described political speech as being "at the core of what the First Amendment is designed to protect." *Virginia v. Black*, 538 U.S. 343, 365 (2003) (plurality opinion). Accordingly, the Supreme Court has recognized the centrality of political speech to the American system on a number of occasions. *See e.g.*, *Roth v. United States*, 354 U.S. 476, 484 (1957) ("The protection given speech and press was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people"); *Terminiello v. City of Chicago*, 337 U.S. 1, 4-5 (1949) ("[I]t is only through free debate and free exchange of ideas that government remains responsive to the will of the people and peaceful change is effected. The right to speak freely and to promote diversity of ideas and programs is therefore one of the chief distinctions that sets us apart from totalitarian regimes").

Furthermore, the Court has also noted that "political speech must prevail against laws that would suppress it, whether by design or inadvertence." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010). To this end, the Court has stated "the First Amendment requires us to err on the side of protecting political speech rather than suppressing it." *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 457 (2007).

The level of protection afforded to political speech does not vary according to the "truth, popularity, or social utility of the ideas and beliefs which are offered." *N.A.A.C.P. v. Button*, 371 U.S. 415, 445 (1963). Rather, "the First Amendment . . . was designed to secure the widest possible dissemination of information from diverse and antagonistic sources." *Buckley v. Valeo*, 424 U.S. at 48-49 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 266 (1964) (quotation

marks omitted); *see also Bridges v. California*, 314 U.S. 252, 270 (1941) ("[I]t is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions."); *United States v. Associated Press*, 52 F.Supp. 362, 372 (S.D.N.Y. 1943) (noting that the First Amendment "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all"). The Court has long recognized that political speech may be offensive, noting that political speech "may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger" while also striking "at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea." *Terminiello v. Chicago*, 337 U.S. 1, 4–5; *see also Bridges v. California*, 314 U.S. 252, 268 ("It must be recognized that public interest is much more likely to be kindled by a controversial event of the day than by a generalization, however penetrating, of the historian or scientist.") With the expansive protections afforded to political speech under the First Amendment, it is perhaps no surprise that vitriolic, and even threatening, language is become in American politics.

The Supreme Court has long established "that the First Amendment reflects a 'profound national commitment' to the principle that 'debate on public issues should be uninhibited, robust, and wide-open'. . . and [has] consistently commented on the central importance of protecting speech on public issues." *Boos v. Barry*, 485 U.S. 312, 318 (1988) (internal citations omitted) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). The protection of the First Amendment includes "politics, nationalism, religion, or other matters of opinion," *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).  Speech may not be restricted "merely because officials oppose the speaker's view." *Airport Comm'rs v. Jews for Jesus*, 482 U.S. 569

(1987) (quoting *Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 46 (1983)).

Importantly, the First Amendment "protects the freedom to engage in association for the advancement of beliefs and ideas." *NAACP v. Patterson*, 357 U.S. 449, 460 (1958).

To suggest that Mr. Liang was acting as a foreign government because he traveled to and from China, communicated with Chinese consulates, and discussed his organization's political activities, is to suggest that every United States citizen who engages in communications with a foreign government--particularly one which the citizen has personal ties to and similar viewpoints--is acting as an agent of that foreign government. Here, the Government has initiated a political prosecution of Mr. Liang, targeting him specifically because his views, and the views of the PRC, are at odds with those of the United States. This is a clear and blatant violation of Mr. Liang's First Amendment rights. He was targeted for a political prosecution under FARA, which has increasingly been used by the Government to target United States citizens with ties to China.

In fact, throughout the indictment, the Government appears to suggest that the fact that Mr. Liang was communicating *at all* with alleged PRC officials was criminal on its face. *See Indictment* at ¶4(f) ("Liang and PRC Official 1 had a 15-minute telephone conversation"); ¶4(g) ("Liang and PRC Official 1 spoke by telephone for approximately 12 minutes); ¶17 ("Liang exchanged four phone calls with PRC Official 2, lasting a total of approximately 7 minutes"); ¶18 ("Liang also placed a telephone call to PRC Official 1. They spoke for approximately three minutes"); ¶19 ("Liang and PRC Official 1 spoke on the phone for approximately eight minutes"); ¶31 ("PRC Official 7 and Liang had a phone call that lasted approximately 18 minutes. Subsequently, on or about July 12, 2022, PRC Official 7 and Liang had another phone call that lasted approximately 10 minutes"). The indictment further suggests the Mr. Liang acted

in somewhat improperly by *attempting* to contact PRC officials. *See Indictment* at ¶14(d) ("Liang attempted to call PRC Official 5 but did not connect"); ¶14(f) ("Liang sent two voice memos to PRC Official 5"). Even still, the indictment points to acts clearly protected by the First Amendment as part of Mr. Liang's alleged criminal conspiracy with the PRC. *See Indictment* at ¶ 37(g) ("Liang organized a counter-protest against anti-extradition, pro-democracy protesters in Boston"); ¶14(j-k) (Liang provides details about plans for a counter-protest to members of his community-based organization); *Patterson*, 357 U.S. at 460 ("the First Amendment protects the freedom to engage in association for the advancement of beliefs and ideas"); *Mills*, 384 U.S. at 218 ("a major purpose of [the First] Amendment was to protect free discussion of governmental affairs"). One wonders whether the government would take a similar view of an American Citizen with ties to Ukraine communicating with the Ukrainian Embassy about pro-Russia protestors or to support the country's effort in its war against Russia.

### D. 18 U.S.C. §951 is Unconstitutionally Vague and Impermissibly Criminalizes Acts Protected by the First Amendment

The statute, as applied to Mr. Liang, and in general, is unconstitutionally vague. The Supreme Court has stated that "the Government violates [the due process guarantee] by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). Further, "The prohibition of vagueness in criminal statutes 'is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law.'" *Id*. at 595-96 (quoting *Connolly v. General Constr. Co.*, 269 U.S. 385, 391 (1926)). Therefore, to comply with due process requirements, a

statute must "provide a person of ordinary intelligence fair notice of what is prohibited" and cannot be "so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

The "twin concerns of inadequate notice and arbitrary or discriminatory enforcement are especially pronounced 'where a vague statute abuts upon sensitive areas of basic First Amendment freedoms' because ambiguity. . . [could] chill[] protected speech." *United States Miselis*, 972 F.3d 518, 544 (4th Cir. 2020) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972)). "[A] statute is facially invalid if it prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285 (2008).

Here, Section 951 on its face "invites arbitrary enforcement." *See Johnson*, 576 U.S. at 595. Section 951 fails to set clear "standards" that do not "allow[] policemen, prosecutors, and juries to pursue their personal predilections." *Smith v. Goguen*, 415 U.S. 566, 575 (1974). Prior to 1984, the Government had acknowledged concerns related to the enforcement of Section 951, noting it was "very unclear as to when notification is required," and the statute did not "contain a definition of the activity which requires registration." *See Mot. to Dismiss*, Exhibit 1 at 1 (Dkt. 173-2), *United States v. Maionica*, No. 1:07-cr-20999 (S.D. Fla. June 20, 2008). In 1984, Section 951 was amended to include the current definition of the term "agent." *See* Pub. L. 98-473, § 1209, 98 Stat. 1837 (Oct. 12, 1984). However, the current definition still "invites arbitrary enforcement," as made clear by the DOJ's own guidance which attempts to set forth some sort of "clarity with respect to the Department's understanding of a key threshold determination in assessing when the requirements of the Act apply-- i.e., the definition of "agent of a foreign principal." *The Scope of Agency Under FARA* at 1; *see Johnson*, 576 U.S. at 595. The DOJ's guidance notes that the term "agent" "goes beyond the common-law definition of

agency," but, "three of the four operative terms in the second clause ('order,' 'direction,' and 'control') convey that the foreign principal exercises some degree of authority over the agent." *The Scope of Agency Under FARA* at 2. It further notes the difficulty in clearly defining a "request" to act by the principal to the alleged agent, writing:

> Although the term "request" is more expansive, we believe that it too must be read to connote some form of authority by the principal over the agent. *See McDonnell v. United States*, 136 S. Ct. 2355, 2368 (2016) ("While not an inescapable rule, [the canon *noscitur a sociis*] is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress.") (internal quotation marks omitted). As the Department of Justice has previously advised, "[i]f we broadly construed the term 'request' to include all forms of argument or persuasion, it would be totally out of line with the other terms, 'agent,' 'order,' and 'direction and control.'" Inquiry Into the Matter of Billy Carter and Libya: Hearings Before the Subcomm. to Investigate the Activities of Foreign Governments of the Senate Comm. on the Judiciary, 96th Cong., 2d Sess., vol. 2, 700, 701 (1980) (statement of Philip B. Heymann, Assistant Attorney General for the Criminal Division) ("Heymann Testimony"). At the same time, however, a mere "request" cannot be equated with an "order," or require a legally enforceable obligation, as that would violate a "presumption" of construction, "that statutory language is not superfluous." *McDonnell*, 136 S. Ct. at 2369 (quoting *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 299 n.1 (2006)). Thus, the Second Circuit has observed that "request" "is not to be understood in its most precatory sense," but should be read to fall "somewhere between a command and a plea." *INAC*, 668 F.2d at 161.

*Id*. at 2-3.

In this case, the statute does not "provide a person of ordinary intelligence fair notice of what is prohibited" and is "so standardless that it authorizes or encourages seriously discriminatory enforcement." *See Williams*, 553 U.S. at 304. The indictment against Mr. Liang does not allege that he was being paid or compensated in any way by the PRC or that he had any explicit agreement to act as an agent on behalf of the PRC. The indictment does not allege that Mr. Liang and the PRC had any type of agreement or arrangement that would show the existence of an agent-principal relationship beyond any of their communications or coordination, however numerous or regular. Instead, the indictment, and the facts alleged therein, could easily be

realleged against millions of United States citizens and/or permanent residents who communicate with embassies on a regular basis.

To suggest Mr. Liang should have known that he had a duty to register as an agent of the PRC is to suggest that any individual who interacts with an embassy must, in turn, register as an agent of a foreign government simply because of their communications with said embassy. It is certainly not uncommon for an individual to communicate with the embassy of their country of origin to coordinate activities or organize visits as Mr. Liang is alleged to have done. It should not then follow that all of those individuals should register as an agent of a foreign government. Therefore, as applied by the government in Mr. Liang's case, Section 951 is overly broad, impermissibly infringes on Mr. Liang's right to free speech, and chills the exercise of freedom of speech protected by the First Amendment. *See Miselis*, 972 F.3d at 544 (4th Cir. 2020) (quoting *Grayned*, 408 U.S. at 109); *See United States v. Alvarez*, 132 S.Ct.2537, 2553 (2012) (Breyer, J., concurring) ("threat of criminal prosecution for making a false statement can inhibit the speaker from making true statements, thereby 'chilling' a kind of speech that lies at the First Amendment's heart").

Additionally, the statute does not define the class of individuals who are required to notify the Attorney General. It states individuals who acts agents of a foreign government must notify the attorney general if they are required to do so under sub-section (b) of the statue. Sub-section (b), however does not provide any guidance as to what conduct triggers the notification requirement. Instead, it states "[t]he Attorney General shall promulgate rules and regulations establishing requirements for notification." The attorney general's rules are not cited or included in the statute. In sum, the law does not give "a person of ordinary intelligence fair notice of what is prohibited." Accordingly, as applied here, Section 951 is unconstitutionally vague,

impermissibly criminalizes acts protected by the First Amendment, and is being arbitrarily enforced against Mr. Liang in a way that would chill protected political speech.

## IV.  CONCLUSION

The indictment against Mr. Liang should be dismissed because it does not allege facts that, if true, would show that Mr. Liang was an agent of the People's Republic of China. Moreover, the way the Government has construed Section 951 impermissibly infringes upon Mr. Liang's constitutional right to free speech, and such an interpretation of Section 951 constitutes arbitrary enforcement, rendering the statute unconstitutionally vague.  For the foregoing reasons, the Defendant requests that dismiss the indictments against him.

Respectfully submitted,
Litang Liang,
By his attorney,

/s/ Derege Demissie
Derege Demissie
BBO # 637544
DEMISSIE & CHURCH
929 Massachusetts Avenue, Ste. 101
Cambridge, MA 02139
 (617) 501-7655

### CERTIFICATE OF SERVICE

I, Derege Demissie, attorney for the Defendant, hereby certify that I have served a copy of the above document via e-file to the attorney representing the United States on May 7, 2024.

/s/ Derege B. Demissie
_____
Derege B. Demissie, Esquire